IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

———————————

**STATE OF ARIZONA**,
*Appellee*,

*v.*

**CHARLES MICHAEL HEDLUND**,
*Appellant*.

———————————

No. CR-93-0377-AP
Filed December 10, 2018

———————————

The Honorable Steven Douglas Sheldon, Judge
No. CR1991-090926 (A)

**Independent Review of Capital Sentence
SENTENCE AFFIRMED**

———————————

COUNSEL:

Mark Brnovich, Arizona Attorney General, Dominic E. Draye, Solicitor General, Lacey Stover Gard, Chief Counsel, Capital Litigation Section, John Pressley Todd (argued), Special Assistant Attorney General, Phoenix, Attorneys for State of Arizona

Jon M. Sands, Federal Public Defender, District of Arizona, Paula K. Harms (argued), Assistant Federal Public Defender, Phoenix, Attorneys for Charles Michael Hedlund

———————————

JUSTICE BOLICK authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE BRUTINEL, and JUSTICES PELANDER, TIMMER, and GOULD joined. JUDGE VÁSQUEZ[*] dissented.

_____

JUSTICE BOLICK, opinion of the Court:

¶1          The Ninth Circuit Court of Appeals found error in this Court's independent review of Charles Michael Hedlund's death sentence and remanded the case to the federal district court with instructions to grant the writ of habeas corpus unless the State stipulates to have the death sentence vacated. We granted the State's motion to conduct a new independent review and now affirm Hedlund's death sentence.

## BACKGROUND

¶2          In 1992, a jury found Hedlund guilty of first degree murder for killing Jim McClain and second degree murder for killing Christine Mertens. *State v. McKinney*, 185 Ariz. 567, 571 (1996) (reviewing factual and procedural history in a consolidated case involving Hedlund). Both killings occurred during a burglary spree committed by Hedlund and his half-brother and co-defendant, James McKinney. The trial judge found two aggravating factors concerning the first degree murder: (1) Hedlund was previously convicted of a serious offense; and (2) he committed the murder for pecuniary gain. *See* A.R.S. § 13-751(F)(2), (F)(5).[1] After hearing the mitigating evidence, the trial judge sentenced Hedlund to death. On appeal, this Court struck the first aggravating factor but affirmed Hedlund's death sentence because it found the mitigating evidence was not

_____

[*] Justice John R. Lopez IV recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Garye L. Vásquez, Vice Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

[1] Section 13-703, the effective statute at the time of Hedlund's crimes and direct appeal, was renumbered as § 13-751 in 2008.

"sufficiently substantial to call for leniency" in light of the pecuniary gain aggravator. *McKinney*, 185 Ariz. at 580–84.

¶3 Hedlund filed a petition for post-conviction relief ("PCR"), which the trial court denied, and this Court denied his subsequent petition for review. In 2003, Hedlund filed a petition for a writ of habeas corpus in the United States District Court for the District of Arizona as well as a motion to expand the evidentiary record, which was denied. The district court ruled that Hedlund was not entitled to habeas relief. In 2017, the Ninth Circuit reversed, concluding that habeas relief was warranted because this Court had erred in its independent review of the death sentence when considering Hedlund's mitigation evidence. *Hedlund v. Ryan*, 854 F.3d 557, 587 (9th Cir. 2017). The Ninth Circuit reasoned that this Court's application of the "unconstitutional causal nexus test" constituted error under *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and this "error 'had [a] substantial and injurious effect' on the sentencing decision." *Hedlund*, 854 F.3d at 586–87 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

¶4 Consistent with *State v. Styers*, 227 Ariz. 186, 187 ¶ 5 (2011), we granted the State's motion to conduct a new independent review. We have jurisdiction under article 6, section 5(6) of the Arizona Constitution and A.R.S. §§ 13-755(A), 13-4031, and 13-4032(4).

## DISCUSSION

### I. Scope of Review

¶5 In granting the State's motion, we ordered the parties to submit briefing on "[w]hether the proffered mitigation is sufficiently substantial to warrant leniency in light of the existing aggravation." This order reflects that our new independent review is focused on correcting the constitutional error identified by the Ninth Circuit. *See Styers*, 227 Ariz. at 187–88 ¶¶ 4–7 (conducting a new independent review in a procedurally similar case). That is, our review is limited to considering the mitigating factors without the causal nexus requirement and reweighing them against the established aggravator.

¶6 Hedlund argues that this Court does not have jurisdiction to conduct a new independent review because this is a non-final case and

instead asks us to remand this case to the trial court for resentencing before a jury. We disagree and reaffirm the scope of review and our holding in *Styers*. *Id.* at 187 ¶ 5 (holding that a "case is final when 'a judgment of conviction has been rendered, the availability of appeal exhausted, and . . . a petition for certiorari finally denied,'" and therefore does not need to be remanded for a new resentencing proceeding under *Ring v. Arizona*, 536 U.S. 584 (2002) (citation omitted)).

¶7 Hedlund also asserts that the United States Supreme Court's recent decision in *Hurst v. Florida*, 136 S. Ct. 616 (2016), requires that he be resentenced. However, *Hurst* only held that a jury must find the facts that support a death sentence—essentially reaffirming the rule the Court articulated in *Ring*. *Id.* at 624; *see also id.* at 621 (discussing *Ring* and stating that a defendant has a "right to have a jury find the facts behind his punishment"). These rules are reflected in Arizona's current statutory scheme. A.R.S. § 13-752.

¶8 We also reject Hedlund's argument that, because the Sixth Amendment requires the entire weighing of evidence be done by the jury, resentencing is required here. Although the United States Supreme Court has held that the Sixth Amendment requires that "the decision of issues of fact must be fairly left to the jury," *United States v. Murdock*, 290 U.S. 389, 394 (1933), *overruled in part on other grounds by Murphy v. Waterfront Comm'n of N.Y. Harbor*, 378 U.S. 52 (1964), the ultimate decision of whether mitigation is substantial enough to warrant leniency "is not a fact question to be decided based on the weight of evidence, but rather is a sentencing decision to be made by each juror based upon the juror's assessment of the quality and significance of the mitigating evidence that the juror has found to exist." *State ex rel. Thomas v. Granville* (*Baldwin*), 211 Ariz. 468, 473 ¶ 21 (2005); *cf. Blakely v. Washington*, 542 U.S. 296, 303 (2004) ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (citing *Ring*, 536 U.S. at 602)). Therefore, the Sixth Amendment does not require this Court to remand for resentencing as the independent review here is not a factfinding determination.

¶9 Finally, we decline Hedlund's invitation to include the evidence newly developed in PCR and habeas proceedings as part of our independent review. Section 13-755(C) establishes our jurisdiction for

independent review and provides that we may "remand[] a case for further action if the trial court erroneously excluded evidence or if the appellate record does not adequately reflect the evidence presented." Thus, § 13-755(C) indicates that additional evidence should be admitted first in the trial court rather than in this Court.

¶10 Further, although we reviewed evidence presented in habeas proceedings in *State v. Clabourne*, the procedural context was different. *See* 194 Ariz. 379 (1999). In *Clabourne*, the independent review was from resentencing in which the defendant presented evidence from habeas proceedings and the sentencing court made findings based on that evidence. *See id.* at 383 ¶ 11. That is not the case here. Hedlund should seek additional PCR if he believes the evidence he presented in the federal habeas proceedings entitles him to it.

## II. Independent Review

¶11 In 1996, this Court upheld Hedlund's death sentence, specifically finding that the mitigating evidence was not "sufficiently substantial to call for leniency." *McKinney*, 185 Ariz. at 580–84. The Ninth Circuit concluded that this Court failed to consider mitigating evidence that was not causally related to Hedlund's crimes. *Hedlund*, 854 F.3d at 583–87. Accordingly, we here conduct a new independent review of the mitigation evidence and balance it against the aggravator.

¶12 Hedlund has the burden of proving mitigation factors by a preponderance of the evidence. *State v. Jones*, 188 Ariz. 388, 400 (1997). When he fails to do so, the asserted mitigation is entitled to no weight. *Id.* at 400–01.

¶13 Hedlund argues that the mitigating evidence—"his extremely abusive childhood, resulting alcohol abuse, [post-traumatic stress disorder], and brain damage, minor participation, remorse, and the plea agreement"—is substantial enough to call for leniency when considered against the sole remaining aggravator, pecuniary gain. However, the aggravator here is especially strong, and Hedlund's active complicity in the crimes is clear. We agree with the well-supported trial court conclusion that Hedlund was "consciously involved in an ongoing crime spree to

commit residential burglaries and intended to either kill or beat any of the victims who might have been present during these crimes."

¶14      Indeed, testimony at trial showed that Hedlund and McKinney asked their peers if they "knew any houses [from which] they could rob like a lot of money and stuff" when planning the crime spree. And as this Court observed in Hedlund's direct appeal, he stated that "anyone he found would be beaten in the head." *McKinney*, 185 Ariz. at 571, 580. Consistent with that statement, Hedlund indicated that if anyone was home during the Mertens burglary "they [could] just sneak in, hit them over the head, knock them out and then take the money." And Hedlund targeted McClain because, based on a prior car sale between them, Hedlund believed McClain had property that would be easy to sell as well as money within the residence. In fact, Hedlund's fingerprints were found on a briefcase within McClain's home, which suggests that Hedlund searched for valuable items. Finally, the evidence shows that Hedlund intentionally armed himself, as demonstrated by his acquisition of a new weapon for the McClain burglary, and actively concealed stolen property and weapons taken during that burglary. This evidence strongly established the pecuniary gain aggravator, which our Court affirmed in 1996, and the Ninth Circuit left undisturbed. *Id.* at 583–84 ("Clearly, the evidence of pecuniary gain as the primary, if not sole, purpose of the murders is overwhelming and inescapable.").

¶15      "When assessing the weight and quality of a mitigating factor, we take into account how the mitigating factor relates to the commission of the offense." *Styers*, 227 Ariz. at 189 ¶ 12. Moreover, although this Court will consider all mitigating evidence presented without requiring a causal nexus between the mitigating evidence and the crime, "we may consider the failure to show such a connection as we assess 'the quality and strength of the mitigation evidence,' and may attribute less weight to the mitigating effect of a disorder if the defendant fails to establish a relationship between the disorder and the criminal conduct." *Id.* (citations omitted). In such a review, this Court will consider statutory mitigating evidence under § 13-751(G) (formerly § 13-703(G)), in addition to non-statutory mitigating factors. *See* § 13-751(G); *State v. Gallegos*, 178 Ariz. 1, 17–18 (1994).

## A. Expert mitigating testimony

¶16 Hedlund asserts that expert testimony he presented during sentencing establishes substantial mitigating weight under § 13-751(G)(1). That statute provides for mitigation when "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." § 13-751(G)(1).

¶17 At the sentencing hearing, two mental health experts testified for the defendant: Dr. Ronald Holler and Dr. Charles Shaw. Dr. Holler met with Hedlund for a two-day interview to evaluate Hedlund's "intellectual, cognitive, neuropsychological, [and] emotional functioning as related to his background with his family and other aspects of his environment." Dr. Holler also based much of his testimony on reports from other sources. Based on this information, Dr. Holler concluded that because Hedlund experienced emotional and physical abuse as a child, he suffered from battered child disorder, post-traumatic stress disorder ("PTSD"), and "intertwined disorders of much consequence including alcohol dependence and a depressive disorder."

¶18 Dr. Holler testified that Hedlund's "mental impairments would significantly impair his capacity to conform his conduct to the requirements of the law" because Hedlund's relationship with his brother, McKinney, "created an unusual or substantial duress in his life" resulting from his desire for family. However, on cross-examination, Dr. Holler also testified that it is possible that Hedlund had sufficient mental acuity to conform his behavior if, hypothetically, a police officer were present during the burglary that resulted in McClain's murder.

¶19 Based on a single interview, Dr. Shaw testified primarily about Hedlund's relationship with alcohol, concluding that Hedlund "suffer[ed] from alcohol dependence or alcoholism." Dr. Shaw testified that individuals with alcoholism can suffer "from perception, memory and judgment problems even [when] not intoxicated," and he had "encountered alcoholics who because of their alcoholism have committed acts they never would have committed but for the existence of alcoholism." Much of Dr. Shaw's testimony was based on Hedlund's self-reported use of alcohol, and Dr. Shaw could not state with any certainty if and by how much Hedlund

was intoxicated on the night of the McClain burglary and murder. However, Dr. Shaw's testimony established that even with alcohol in his system, an individual would not "lose complete awareness of what is moral" but it might affect judgment regarding what is wrong under the law or what the individual can "get away with." In addition, "Hedlund's character witnesses testified that Hedlund did not have a drinking problem, was not an alcoholic, and that his level of consumption was far below what Hedlund reported to the psychiatric experts." *McKinney*, 185 Ariz. at 579; *see also infra* ¶¶ 26–27.

**¶20** Based on our independent analysis, we conclude, as did the trial court, that the expert testimony had little credibility or probative value. Though the dissent asserts that the experts' opinions provide strong evidence of mitigation because the State provided no expert testimony to rebut Hedlund's experts, *infra* ¶ 52, rebuttal was unnecessary as the State brought out key testimony during cross-examination of Dr. Holler and Dr. Shaw that effectively impeached their opinions and weighed against mitigation. We are particularly persuaded by Dr. Holler's opinion that Hedlund was capable of modifying his behavior if an officer had been present and Dr. Shaw's opinion that Hedlund remained aware of what was moral. This evidence undermines Hedlund's and the dissent's view that he suffered mental impairments that significantly impaired his capacity to conform his conduct to what the law requires. Additionally, the experts testified that Hedlund's mental impairments result from his childhood neglect and abuse at least a decade prior to the crimes. Just before the crime spree, Hedlund had a responsible job and exhibited no violent behavior; he acted lucidly in planning and executing the crimes and in attempting to dispose of and hide the murder weapon. The evidence does not support the conclusion that Hedlund lacked the ability to conform his conduct to the requirements of law.

**¶21** The dissent asserts that *State v. Stevens*, 158 Ariz. 595 (1988), applies here and shows that we should give Dr. Holler's testimony strong mitigating weight. *Infra* ¶ 71. Because *Stevens* is inapposite, we disagree. In *Stevens*, we gave strong mitigating weight to expert testimony introduced by the defendant because it showed "his ability to conform his behavior [to] the requirements of the law were [sic] impaired at that time." *Stevens*, 158 Ariz. at 599–600 (alteration in original). The dissent suggests

that the *Stevens* Court relied on the fact that the defendant had a "mental disorder" that caused his diminished capacity. *Infra* ¶ 54. However, this Court actually concluded "Stevens' condition at the time of the offense was a major and contributing cause of his conduct" based primarily on the expert testimony that the defendant's "actions were the result of his heavy use of alcohol and drugs preceding his meeting with the victims and a well-developed habit of acting out on socially unacceptable impulses while under the influence of such intoxicants." *Stevens*, 158 Ariz. at 599–600. In contrast, the only evidence of Hedlund's alleged intoxication during the McClain murder was his own self-reporting to Dr. Shaw well after the murder; as such, *Stevens* is distinguishable as it is unclear if Hedlund was intoxicated during the commission of the crimes. Even if Hedlund was intoxicated when he committed the McClain burglary and murder, nothing in the record suggests alcohol affected his ability to appreciate right from wrong or conform his conduct to law, unlike the defendant in *Stevens*. *Infra* ¶¶ 26–27.

¶22 In sum, the expert testimony and the record do not establish that Hedlund could not appreciate right from wrong or conform his conduct to the requirements of law. Accordingly, we give the expert testimony regarding Hedlund's PTSD, alcoholism, and depressive disorder slight mitigating weight.

### B. Other mitigating circumstances

¶23 Hedlund presents other mitigating evidence, namely his emotionally and physically abusive childhood and dysfunctional family life, intoxication, minor participation, remorse, and the rejected plea agreement. We address the proffered mitigation evidence in turn.

1. Emotionally and physically abusive childhood and dysfunctional family life

¶24 Testimony from Hedlund's family and friends establish that Hedlund experienced a very abusive childhood. He was neglected, beaten, and punished for basic daily activities like eating and drinking water. Moreover, his step-mother would frequently isolate Hedlund and punish him because he was born out of wedlock. And Hedlund grew up in a household where stealing was encouraged and rewarded.

¶25        Hedlund left the home around age thirteen, more than ten years before the crimes, and no evidence shows that Hedlund's difficult childhood affected his ability to control his actions to conform with the law. Hedlund's feeling of responsibility "to hang around with his brother, James, out of some twisted loyalty to the only family he knows"—as Dr. Holler suggested—does not amount to an inability to control his actions. Thus, despite the terrible conditions in which Hedlund was raised, we assign this evidence little weight because there is neither temporal proximity nor any demonstration that the conditions rendered Hedlund unable to differentiate right from wrong or to control his actions. *Supra* ¶¶ 16–22; *see, e.g.*, *State v. Burns*, 237 Ariz. 1, 34–35 ¶¶ 169–71 (2015) (affirming a death sentence despite a "difficult childhood" and "dysfunctional family"); *State v. Bocharski*, 218 Ariz. 476, 499 ¶ 111 (2008) ("Also, Bocharski committed this offense when he was thirty-three years old, lessening the relevance of abuse and neglect that occurred during his childhood.").

### 2. Intoxication

¶26        Hedlund argues that his intoxication at the time of the murder was a mitigating factor. We consider this evidence as both a statutory mitigating circumstance under § 13-751(G)(1) and a non-statutory mitigating factor. We find little credibility in Hedlund's self-reporting because he had a motive to lie and evidence presented at trial proved he had been untruthful. Moreover, witness testimony contradicts Hedlund's assertion that his behavior was affected by intoxication. In fact, Hedlund's own witnesses testified that his drinking habits did not interfere with his work and that he did not get violent when drinking, but instead became drowsy.

¶27        The methodical and obviously deliberate commission of the crime and his subsequent conduct in attempting to sell his gun the day after the McClain murder strongly suggest Hedlund was in possession of his faculties and not so impaired by alcohol as to constitute significant mitigation. *Cf. Bocharski*, 218 Ariz. at 499 ¶ 111 ("First, Bocharski's actions immediately following the crime constituted purposeful steps to avoid prosecution and therefore his claim of alcohol impairment is diminished."). Thus, we do not find sufficient reliable, credible evidence to satisfy

statutory mitigation under § 13-751(G)(1), and we give intoxication at the time of the murder little weight as a non-statutory mitigating factor.

### 3. Minor participation

**¶28** Hedlund also presents his supposed minor participation as a mitigating factor based on witness testimony—by Chris Morris and Joe Lemon, two individuals who had participated in other burglaries during the crime spree—that he was only involved in the burglary as the driver and that the murder is inconsistent with his character. However, his claim of minor participation is contradicted by the jury finding him guilty of premeditated murder in a special verdict, which necessarily requires that Hedlund was a major participant. *See State v. Hoskins*, 199 Ariz. 127, 150 ¶ 100 (2000) (rejecting defendant's argument that he was a minor participant because the jury found that he committed premeditated murder and thus concluded that defendant was a major participant in the murder beyond a reasonable doubt). Moreover, we previously stated that "there is ample evidence pointing to Hedlund as the one who killed Jim McClain." *McKinney*, 185 Ariz. at 580. We therefore give no mitigation weight to this argument.

### 4. Remorse

**¶29** Hedlund further offers his expressions of remorse as mitigating evidence. *See Bocharski*, 218 Ariz. at 498 ¶ 107. While Hedlund expressed remorse to his mitigation specialist for the victim's family, he

11

continues to maintain that he was not involved in the murder. At the sentencing hearing, Hedlund made this statement:

> I don't see how anybody could not have [remorse for this]. I can't imagine going through what these families have been through. . . .
>
> I met Mr. McClain on several different occasions. There's no way I could have done what happened to this man or let it happen if I would have known it was going to happen. There is no way I could have personally done that.
>
> . . . .
>
> . . . I personally did make some bad decisions when I first started hanging around with James [McKinney]. And, it's [sic] resulted in a good portion of this, yes. But I wasn't, I wasn't actually involved in hurting anybody, not directly.

Hedlund's continued evasions undercut the sincerity of his expressions of remorse.

### 5. Plea agreements

¶30 Hedlund also presents two plea agreements as mitigating evidence. The trial court rejected the first plea agreement requiring Hedlund to plead guilty to second degree murder and class 4 theft as the court concluded that the plea agreement did not require Hedlund to take sufficient responsibility for the McClain murder. The trial court recounted that "given the pending charges, the evidence and arguments that had previously been presented to the Court at that time and now, that such a disposition offered in the plea agreement was totally unwarranted in the interests of justice." We have considered the existence of the plea agreement and the extent to which it demonstrates the State's belief that Hedlund does not deserve the death penalty. We conclude it offers little mitigating weight. *Cf. State v. Miller*, 186 Ariz. 314, 326, 328 (1996) (affirming defendant's death penalty despite the presence of a plea agreement offer for a life sentence that the defendant rejected).

¶31 Plea offers can be made for reasons that have nothing to do with whether a prosecutor believes the defendant deserves the death penalty. For example, a prosecutor might offer a plea because of a

perceived weakness in the case or in an attempt to "turn" the defendant into a state witness. In addition, a court has discretion to accept or reject plea offers to facilitate the fair administration of justice. *See State v. Lee*, 191 Ariz. 542, 544 ¶¶ 6–7 (1998) (citing Ariz. R. Crim. P. 17.4(d)). Thus, the first plea agreement Hedlund presents is entitled to only slight mitigating weight.

**¶32** Hedlund and the dissent assert that a purported second plea agreement should be given substantial mitigating weight, suggesting that had it been timely submitted to the trial court by trial counsel, it would have been accepted. *Infra* ¶¶ 58–59. Neither Hedlund nor the dissent provide any evidence supporting this assertion. Nothing in the record shows that a second plea agreement was ever formally submitted to the trial court. Moreover, even if the purported second plea agreement had been submitted to the trial court for consideration, nothing indicates the court would have accepted it. As the Ninth Circuit observed, it is likely that the trial judge would have rejected the purported second agreement given that it only added a plea to a burglary count on top of the pleas to second degree murder and theft from the first plea agreement. *Hedlund*, 854 F.3d at 579. Because the trial court had previously indicated it wanted Hedlund to take more responsibility for McClain's murder, the mere addition of a burglary count likely would not have persuaded the court to accept the plea agreement.

**¶33** As such, we give this mitigating evidence some weight but do not consider it substantial.

### C. Leniency is not warranted

**¶34** In our independent review, we must consider the aggravator, pecuniary gain, and all mitigating evidence presented to determine whether the mitigation evidence individually or cumulatively is sufficiently substantial to call for leniency. Here, we believe that the (F)(5) aggravator is especially strong given that financial gain motivated a string of burglaries, in which the possibility of murders was expressly contemplated, culminating in the shooting of McClain in the back of the head while he slept. In fact, Hedlund was aware that McKinney, before holding Mertens face down and shooting her in the back of the head, had "[b]eaten and savagely stabbed" her, and she had futilely "struggled to save

her own life." *McKinney*, 185 Ariz. at 572. Despite that knowledge, Hedlund willingly planned and actively participated in the McClain burglary and murder less than two weeks later. *Id.* And Hedlund's only motive in shooting McClain was to facilitate the burglary—it was not merely the unintended result of a burglary gone awry. *See State v. Spears*, 184 Ariz. 277, 295 (1996) (finding sole aggravator of pecuniary gain was particularly strong given that "it was the only motive" for the murder and not simply a "robbery gone awry which result[ed] in a death"). Indeed, we previously stated that "pecuniary gain [w]as the primary, if not sole, purpose of the murders," *McKinney*, 185 Ariz. at 583–84, and that issue is not properly before us in this limited review.

¶**35** The dissent takes issue with the weight we give the pecuniary gain aggravator because it contends "there is no evidence which brother shot McClain." *Infra* ¶ 67. The record says otherwise. Hedlund brought his gun to McClain's home the night of McClain's murder; Hedlund sawed off the gun to better conceal it prior to the McClain burglary; the bullet that killed McClain was not inconsistent with Hedlund's gun; Hedlund sought to sell his gun the day after McClain's murder; Hedlund concealed the gun after McClain's murder; Hedlund's fingerprints were found on the gun's magazine when it was seized by police; and forensic testing indicated there was blood on Hedlund's gun. This evidence also buttresses the jury's finding that Hedlund was a major participant in McClain's murder, *supra* ¶ 28, a point the dissent concedes, *infra* ¶ 59 n.4. In fact, this Court previously concluded there was "ample evidence" that Hedlund killed McClain, *McKinney*, 185 Ariz. at 580, an issue that is not before us.

¶**36** The dissent also suggests that the murders were not motivated by pecuniary gain as Hedlund "took only some 'wheat pennies'" from an earlier burglary in which approximately $5.00 was stolen. *Infra* ¶ 65. The dissent's assertion is factually inaccurate; Hedlund received half the proceeds from the Mertens burglary and also took property from the McClain burglary, including a car and three guns. Further, the poor results of one burglary within the crime spree do not negate the fact that the burglary that resulted in McClain's murder was motivated by pecuniary gain. *See State v. Lynch*, 225 Ariz. 27, 40 ¶ 73 (2010) ("[T]he [pecuniary gain] aggravator requires only that the desire for pecuniary gain motivated the murder.").

14

¶37 Hedlund and the dissent assert that this case is factually similar to *Bocharski*, where we reduced the defendant's death sentence to a life sentence. 218 Ariz. at 499 ¶¶ 112–13. However, *Bocharski* is materially distinguishable. Bocharski presented seven mitigating factors including: "(1) A.R.S. § 13-703.G.1 (state of mind), (2) physical, mental, and sexual abuse of the defendant, (3) history of substance abuse and alcoholism, (4) dysfunctional family of origin including multigenerational violence, criminality, and substance, sexual, emotional, and physical abuse, (5) abandonment, severe neglect, starvation, and foster care placement, (6) impact of execution on the defendant's family, and (7) remorse." *Id.* at 495–96 ¶ 94. Although we specifically discounted the mitigating evidence of abuse, neglect, and alcohol impairment, *id.* at 499 ¶ 111, we ultimately found leniency was appropriate because we found substantial evidence of mitigation, while the sole aggravator, age of the victim, was "not particularly strong," *id.* ¶ 112. Indeed, the dissent's reliance on the evidence of the childhood abuse in *Bocharski* as establishing that Hedlund has shown substantial mitigation is misplaced as *Bocharski* specifically discounted evidence of childhood abuse as attenuated. *Id.* ¶ 111 ("Also, Bocharski committed this offense when he was thirty-three years old, lessening the relevance of abuse and neglect that occurred during his childhood."). Although the dissent argues this case is like *Bocharski* because "Hedlund's childhood abuse is 'unique in its depth and breadth,'" *infra* ¶ 53, it was not the "depth and breadth" of the history of childhood abuse in *Bocharski* that led this Court to grant leniency; rather, the defendant's "mitigation evidence was unique in its depth and breadth" as a whole while the aggravator was "not particularly strong." *Id.* at 498–99 ¶¶ 109–11. In contrast, here the aggravating factor of pecuniary gain is particularly strong while the mitigation evidence is not substantial.

¶38 *State v. Graham*, 135 Ariz. 209, 213 (1983), in which we determined that leniency was appropriate, is also distinguishable. We found that mitigating evidence of (1) impaired capacity, (2) lack of prior criminal history, and (3) Graham's age of twenty-one years old (although given little weight) outweighed the sole aggravator of pecuniary gain. *Id.* Our finding of impaired capacity was linked to credible expert testimony. *Id.* Indeed, the expert testimony showed Graham's impaired capacity was the product of drug abuse stemming from "legal and professional sanction" that was not entirely of his own making. *Id.* Here, however, the expert

testimony in the trial court was not persuasive and nothing else in the record indicates that Hedlund had impaired capacity, as discussed above. *Supra* ¶¶ 16–22.

¶**39**      Having considered all mitigating evidence, we conclude that the evidence presented is not sufficient to warrant leniency in light of the commission of a murder for pecuniary gain. *See State v. Harrod*, 218 Ariz. 268, 284 ¶¶ 63–64 (2008) (affirming the defendant's death sentence when the sole aggravating factor, pecuniary gain, was weighed against the mitigating evidence presented); *State v. Roseberry*, 210 Ariz. 360, 373–74 ¶¶ 77–79 (2005) (same); *Spears*, 184 Ariz. at 295 (same).

## CONCLUSION

¶**40**      We affirm Hedlund's death sentence.

VASQUEZ, J., dissented.

¶41      At the State's request, this Court has conducted an independent review of Charles Michael Hedlund's death sentence and today affirms that sentence after concluding the mitigating evidence is not sufficiently substantial to outweigh the single aggravating circumstance. Because I disagree with this conclusion, I respectfully dissent. The death penalty is reserved for "those who stand out from the norm of first degree murderers." *State v. Spears*, 184 Ariz. 277, 295 (1996) (quoting *State v. Smith*, 146 Ariz. 491, 505 (1985)). As explained in more detail below, Hedlund does not meet this criterion.

**Childhood Abuse and Expert Testimony**

¶42      Although the majority characterizes Hedlund's childhood abuse and neglect as "very abusive," *supra* ¶ 24, it was nothing short of horrific. When he lived with his biological mother and stepfather, McKinney Sr., until the age of six or seven, he and his siblings were subjected to extreme neglect. They ate only if they were able to get food themselves, and, when they did, it was often moldy and rotten. They were rarely clothed and, when they were, it was in "filth-encrusted clothes." They lived and slept surrounded by animal feces and urine. Hedlund's mother "would stack used [feminine hygiene products] around rooms in the house" and never cleaned the children's diapers. Mary Durand, a presentence report investigator, described the conditions "as gruesome as anything that [she had] come across in 25-plus years in this business."

¶43      When the children moved in with McKinney Sr., their stepmother, and her daughter, the neglect continued, with the addition of severe physical and mental abuse. Hedlund, the oldest, was the only one of his siblings to have a different father, and his stepmother would tell him daily that "he was a bastard child" who "didn't have a father." The house was "always dirty," as were the children who often "smelled like animal dung." The McKinneys kept animals such as a goat and calf, chickens, monkeys, and snakes inside the house. Even though the children were terrified of snakes, their cage was kept inside the closet of the children's

bedroom. If the children did not clean up the animals' feces, it "didn't get cleaned up."

¶44 The children were not allowed to have food unless approved by their stepmother and were beaten if they ate or drank without her permission. She also frequently locked them out of the house, typically without adequate clothing and with no food or water for hours at a time and in temperatures upward of 100 degrees.

¶45 Their stepmother, often with the help of her daughter, beat the children daily with objects ranging from "belts with steel prongs" to "wire hangers" and cooking pans. Hedlund, however, "got more beatings than [the other children], because he wasn't a McKinney." Hedlund's sister[2] recalled that either their stepmother or her daughter would "hold [Hedlund] down on the ground . . . [and] the other one would beat him." In one incident, McKinney Sr.'s dog attacked Hedlund, resulting in over 200 stitches to his face. The next morning, his stepmother woke Hedlund and beat him for an hour "because it cost[] her money to take him to the hospital." Additionally, whenever Hedlund's half-brother and co-defendant, James McKinney, would get into trouble, Hedlund would be beaten as well because he "was the oldest and . . . should have known better."

¶46 A theme that pervades the family's recollections of Hedlund as a child was that he consistently tried to protect his siblings from the abuse and would take their beatings for them. His sister recalled, "If we were going to get a beating or slapped in the face or punched in the face, [Hedlund] would jump in the middle and he would take the hit for us." During one instance, their stepmother grabbed McKinney by the wrist, lifted him into the air, and began beating him with a piece of garden hose. Hedlund "jumped on her arm and was begging her, 'Momma, stop it. Momma, stop it.'" The stepmother flung Hedlund onto the sidewalk, where he hit the back of his head, and then hit him across the face with the hose. Not only did he protect, or try to protect, his siblings from his

---

[2] She is actually Hedlund's half-sister.

stepmother's abuse, he also tried to protect his sisters from McKinney, who would often hit them with boards, shovels, and rakes.

¶47      Dr. Holler explained that Hedlund's childhood abuse caused lasting neuropsychological impairments, as reflected, in part, by a disparity in his IQ scores.  Hedlund's verbal IQ—associated with the left side of the brain—was 91, but his performance IQ—associated with the right side— was 78.  The low performance IQ is indicative of difficulty "using good judgment and avoiding getting [oneself] into severe difficulties."

¶48      According to Dr. Holler, Hedlund's childhood experiences, in particular the constant reminders that he was not fully biologically related to his family, caused him to become "a very needy person psychologically" and he had "developed a distortion of motivations to be accepted in a familial sense."  He was thus "very vulnerable and subject to becoming enmeshed with others . . . to try to become a member of a family."  He also took on a "docile" and "accom[m]odating" nature, such that if someone were to become more aggressive, Hedlund "would be very much subject to going along" with that person in order to maintain his role as protector and fulfill his need to demonstrate loyalty.  Dr. Holler ultimately concluded that Hedlund's childhood abuse and resulting mental impairments "significantly impair[ed] his capacity to conform his conduct to the requirements of the law."

¶49      Dr. Holler's opinions are supported not only by the testimony of Hedlund's siblings but also by others who knew him throughout his life. One of his aunts described him as a "quiet" child who "ached for someone to love him."  His childhood friend noted he would always look out for her and keep her "out of trouble."  And his sister testified that even though Hedlund was the oldest sibling, when they were children "whatever [McKinney] said [Hedlund] did."

¶50      Each person who knew Hedlund as a child and adult testified he was a quiet, "mild mannered," non-violent person who avoided confrontation and was "scared" of getting "into fights."  As an example, while McKinney and C.M., Hedlund's other half-brother, were committing another burglary, Hedlund, who was supposed to pick them up afterwards,

abandoned them and drove away because he was "scared of getting caught and he didn't want to be near the burglary."

¶51 Hedlund's childhood efforts to protect his siblings, even at the risk of his own personal safety, continued into his adulthood. His sister testified that Hedlund protected her from abusive boyfriends. C.M. testified that Hedlund's involvement in the Mertens's burglary came about because he "wanted to protect [C.M.]" from "get[ting] caught or get[ting] in trouble" because the people in the Mertens's house knew C.M. and would be able to identify him. And, in the months leading up to these crimes, when McKinney and Hedlund were spending considerable time together, Hedlund told their sister he feared McKinney "would go right back to prison" if "he had no one to talk to . . . and be his friend and a family member."

¶52 The State did not call any of its own expert witnesses to contradict those presented by Hedlund. Additionally, because the lay witnesses' testimony supported Dr. Holler's opinions, his testimony is entitled to "serious consideration" as a mitigating factor. *State v. Trostle*, 191 Ariz. 4, 21 (1997) (defendant's unrebutted expert testimony regarding mental illness and social dysfunction, supported by lay witnesses' descriptions of defendant, warranted "serious consideration" as a mitigating factor). Thus, contrary to the majority's assertion that "no evidence shows that Hedlund's difficult childhood affected his ability to control his actions to conform with the law," *supra* ¶ 25, the expert testimony introduced by Hedlund, together with the corroborating lay testimony, did exactly that. It demonstrates a causal connection between Hedlund's childhood that contributed to the murder of McClain: When faced with a choice between demonstrating loyalty to and protecting his brother, or conforming his conduct to the law, Hedlund's judgment and ability to choose the latter was significantly impaired. *See State v. Bocharski*, 218 Ariz. 476, 496 ¶¶ 96–97, 110 (2008) (causal connection established by expert testimony that defendant's "troubled upbringing" caused lasting psychological damage that likely played "substantial role in the events that led to" victim's murder).

¶53      The majority contends this case is distinguishable from *Bocharski*. *Supra* ¶ 37. I disagree. The mitigating evidence in this case is very much like that presented in *Bocharski*. *See Bocharski*, 218 Ariz. at 497 ¶¶ 102–07, 109–10. For instance, like Bocharski, Hedlund's childhood abuse is "unique in its depth and breadth." *Id.* at 498–99 ¶ 109. Dr. Holler's testimony, like the expert in *Bocharski*, established a "causal connection" demonstrating that Hedlund's childhood abuse significantly impaired his cognitive reasoning and ability to exercise good judgment. *Id.* at 499 ¶ 110.

¶54      The majority gives "slight" weight to Dr. Holler's testimony based, in part, on his opinion that Hedlund could have modified his behavior had a police officer been present. *Supra* ¶¶ 20–22. Dr. Holler, however, clarified that without the hypothetical police officer's immediate presence, Hedlund's "dynamics [would] become predominant" and "lead him into actions which in terms of strictly intellectual capability, he would not do." Although the majority overlooks this nuanced opinion, there was no police officer present on the night of McClain's murder, so Hedlund's judgment indeed was influenced by what Dr. Holler characterized as his "neuropsychological impairment" at the time. *See State v. Stevens*, 158 Ariz. 595, 599–600 (1988) (reducing death sentence to life imprisonment based, in part, on psychiatrist's testimony that defendant had "capacity to appreciate right from wrong" but "mental disorder" impaired his "ability to conform his behavior [to] the requirements of the law" at time of crime).

¶55      The majority also assigns "little weight" to the evidence of Hedlund's childhood abuse and its impact on Hedlund's psyche because "[he] left the home around age thirteen, more than ten years before the crimes." *Supra* ¶ 25. For the following reasons, I disagree with that assessment as well.

¶56      First, Dr. Holler's testimony shows that although Hedlund physically removed himself from the abuse, its effects did not simply end with a change in his physical surroundings. His neuropsychology and brain development were shaped by the years of abuse he endured, and it is unreasonable to believe any negative impact resolved after he moved out of the abusive environment. Second, Hedlund's life after leaving McKinney Sr.'s home was far from idyllic. After he moved out, he dropped out of

school at age fourteen and began working as an agricultural field worker, picking cotton, vegetables, and sugar cane. When he was seventeen or eighteen, Hedlund attempted suicide. Third, after Hedlund left McKinney Sr.'s home, McKinney stayed behind and the brothers were separated. Before McKinney reappeared in Hedlund's life, Hedlund had held a steady job, been a reliable employee, and paid his bills. In the few months before these crimes, however, McKinney was released from jail and began demanding Hedlund's attention. Also during that time, McKinney Sr. and their stepmother had begun living with their aunt. Both of those circumstances caused Hedlund to "[get] back around his father" during this time. Thus, although Hedlund was not living in the same house with the daily abuse at the time of the crimes, he had recently become surrounded by circumstances reminiscent of that time in his life.

¶57 Viewing the evidence cumulatively, as we must, *see State v. White*, 194 Ariz. 344, 350 ¶ 19 (1999); *see also State v. Kayer*, 194 Ariz. 423, 432–33 ¶ 28 (1999), it shows that Hedlund's childhood abuse and neglect significantly impacted his behavior and is therefore entitled to substantial weight, *see State v. Towery*, 186 Ariz. 168, 189 (1996); *see also State v. Wallace*, 160 Ariz. 424, 427 (1989).

### Plea Agreement

¶58 I further disagree with the weight the majority attributes to the plea agreement that the trial court rejected. *See supra* ¶¶ 30–31. The initial plea agreement provided that Hedlund would plead guilty to second-degree murder as to Mertens and theft "[s]tacked with a prior" as to McClain. After the trial court rejected this agreement, the State and Hedlund reached a second plea agreement with the court's guidance.[3]

---

[3] In 1996, this Court stated that there was no record of a second plea agreement. *McKinney*, 185 Ariz. at 575. The Ninth Circuit, however, stated that the parties "reportedly arrived at a second agreement consisting of a guilty plea for the second degree murder of Mertens, and theft with a prior and burglary non-dangerous with respect to McClain." *Hedlund v. Ryan*, 854 F.3d 557, 575 (9th Cir. 2017). This is supported by Hedlund's notice for

Under that agreement, Hedlund would plead guilty to second-degree murder for Mertens's murder, and theft and burglary in the McClain case. The plea was never presented to the court, however, because Hedlund's counsel allowed the deadline to lapse, choosing instead to file a notice for change of judge to hear the plea.

**¶59** The majority assigns only "some weight" to the plea agreements, asserting: "Plea offers can be made for reasons that have nothing to do with whether a prosecutor believes the defendant deserves the death penalty." *Supra* ¶ 31. This may be true generally, but this case involves not one but two plea offers, the second of which would have permitted Hedlund to plead guilty to theft and burglary for the crimes committed against McClain, the same incident for which the death penalty is being affirmed. It is significant that had Hedlund's counsel not missed the deadline for entering a plea, Hedlund might not be facing the death penalty. Although we cannot know whether the trial court would have accepted the second plea, both offers are evidence that the State did not regard Hedlund as being as culpable as McKinney, who, from the record, it appears was never offered a plea. "The plea offer's mitigatory effect is clear: the prosecution thought this was not a clear-cut death penalty case." *Scott v. Schriro*, 567 F.3d 573, 584 (9th Cir. 2009). Accordingly, I believe this is entitled to substantial weight.[4]

---

change of judge, in which he indicated the parties had reached the second agreement, as well as the prosecutor's testimony that they had been in negotiations for a second plea agreement.

[4] As to the remaining mitigating factors, I agree that, despite evidence supporting them, *see State v. Watson*, 129 Ariz. 60, 63 (1981) (court must review "all the records"), they are entitled to little or no weight, *see State v. Hargrave*, 225 Ariz. 1, 19 ¶ 82 (2010) ("minor participation" not established in killings when defendant involved in planning and execution of robbery and knew co-defendant prepared to kill, despite not being shooter and not intending victims harm); *see also State v. Dann*, 220 Ariz. 351, 376 ¶ 150 (2009) (evidence of remorse entitled to little weight "when the defendant denies

**Sole Aggravator: Pecuniary Gain**

**¶60**        The majority states the pecuniary gain aggravator here is "especially strong." *Supra* ¶¶ 13, 34.  Although I agree that we must accept this aggravator as having been proven, I disagree with the characterization of its strength.  *See State v. Richmond*, 136 Ariz. 312, 320 (1983) (independent review requires this Court to "determine for ourselves the . . . weight to give" aggravating factor).

**¶61**        Cases in which this Court affirmed the death penalty where the sole aggravator was pecuniary gain are not common. And, a comparison of those cases reveals striking similarities that shed light on the strength of the aggravating circumstance in this case.  Not only were the murders in those cases carefully conceived and planned, but there was an intimate relationship of trust between the victim and the defendant, or they involved a murder-for-hire killing arranged by the victim's loved one.  *See State v. Harrod*, 218 Ariz. 268, 284 ¶ 63 (2008) (pecuniary gain in context of contract killings "especially strong"); *see also Spears*, 184 Ariz. at 282, 292–93 (defendant began romantic relationship with victim in preconceived plan to obtain her truck and money); *State v. Willoughby*, 181 Ariz. 530, 533, 548–49 (1995) (pecuniary gain based on "deliberate, carefully conceived, meticulously planned, and cold-blooded scheme to kill . . . [defendant's] unsuspecting wife"); *State v. White*, 168 Ariz. 500, 503, 510–13 (1991) (defendant and romantic partner schemed to kill partner's husband to collect insurance proceeds), *abrogated on other grounds by State v. Salazar*, 173 Ariz. 399, 416–17 (1992).  Indeed, in *Willoughby*, this Court noted that although the mitigating evidence in that case would typically "weigh heavily in favor of leniency," it was not warranted "given the strength and quality of the aggravating circumstance."  181 Ariz. at 549.

---

responsibility for his conduct"); *State v. Medrano*, 185 Ariz. 192, 194–95 (1996) (no question defendant used cocaine on night of murder, but "primary issue is whether defendant has shown that he was significantly impaired at the time, and that is where the evidence falls short").

**¶62** Conversely, in the cases where this Court reduced to life imprisonment a death sentence that had been based on pecuniary gain as the sole aggravator, there was no indication of a well thought-out, long-term plan, nor was there an intimate relationship of trust between the defendant and the victim. *See Stevens*, 158 Ariz. at 596 (reducing death penalty to life imprisonment where defendant, at pre-arranged drug sale with co-worker, robbed and shot co-worker's companion); *State v. Marlow*, 163 Ariz. 65, 71–72 (1989) (leniency warranted where defendant robbed and killed victim who had won substantial sum at casino earlier that night); *see also State v. Rockwell*, 161 Ariz. 5, 8, 16 (1989) (death penalty reduced to life sentence for murder that occurred in course of truck-stop robbery).

**¶63** In *State v. Graham*, for example, the defendant, after a night of drinking, decided to rob the victim at his home, obtained a gun, and shot the victim when he opened the door. 135 Ariz. 209, 210 (1983). In mitigation, the defendant showed he suffered from a long-term substance abuse problem, had no prior record revealing a tendency toward that type of violent crime, and was described as "a nonaggressive and passive individual who [was] easily influenced by others." *Id.* at 213. By focusing on the lack of mitigating evidence of substance abuse in this case, the majority has discounted its similarities to *Graham* with respect to the aggravating circumstance of pecuniary gain. *See supra* ¶ 38.

**¶64** I acknowledge that Hedlund knew McClain, having previously purchased a car from him, and the crimes involved some planning, arguably making them somewhat similar to cases like *Spears*, *Willoughby*, and *White*. *See State v. McKinney*, 245 Ariz. 225, 228 ¶ 12 (2018) (McKinney leader in planning and executing burglaries). But the relationship between Hedlund and McClain is far from the intimate relationships in *Spears*, *Willoughby*, and *White* and more akin to that of an acquaintance, as in *Graham* or *Stevens*. Moreover, the common thread in all the above cases—reduced sentence or not—is that pecuniary gain was *the* motivating factor. Here, however, the record shows that not only was pecuniary gain just one

of Hedlund's motives, it likely was not his primary motivating factor.[5] *See State v. Acuna Valenzuela*, 245 Ariz. 197, 222 ¶ 42 (2018) ("[P]ecuniary gain need not be the only motive for the . . . aggravator to apply."); *see also State v. Martinez*, 218 Ariz. 421, 435 ¶ 66 (2008) ("Pecuniary gain . . . need only be a motive for the murder, not the sole motive."). Thus, although the state proved pecuniary gain beyond a reasonable doubt, the evidence supporting it, given Hedlund's competing motivations, is not especially strong. *See State v. Bearup*, 221 Ariz. 163, 172 ¶ 44 (2009) (court must independently consider quality and strength of aggravating factors).

**¶65** On the night McKinney proposed committing burglary, Hedlund repeatedly stated he was not interested and thought it was "a stupid idea." Hedlund had a steady job, owned his car, could afford what small bills he had, and was able to financially assist his sisters and mother. When McKinney offered Hedlund items stolen from the burglaries McKinney and C.M. committed, Hedlund took only some "wheat pennies," saying he did not want anything else. These facts suggest financial gain was not Hedlund's primary motivation. Conversely, the evidence shows that financial gain was the motivating factor for McKinney. He had no job, no car, owed thousands of dollars in fines, and he was the one who proposed the burglaries to find cash and property to sell. *See McKinney*, 245 Ariz. at 227–28 ¶ 12; *see also Spears*, 184 Ariz. at 292–93 (defendant's lack of money and source of income supported finding pecuniary gain).

**¶66** The majority points out that Hedlund stated that "anyone he found would be beaten in the head" as evidence of Hedlund's "active complicity in the crimes." *Supra* ¶ 14 (quoting *McKinney*, 185 Ariz. at 571, 580). Indeed, Hedlund did say that he would hit anyone on the head who

---

[5] On direct review in 1996, this Court stated, and the majority now quotes, *see supra* ¶ 14, "Clearly, the evidence of pecuniary gain as the primary, if not sole, purpose of the murders is overwhelming and inescapable." *State v. McKinney*, 185 Ariz. 567, 584 (1996). The Court, however, provided no analysis supporting that statement. Although it is true as it applies to McKinney, for the reasons that follow, the evidence simply does not support that same conclusion as it applies to Hedlund.

was home. But that was only in response to McKinney's assertion that he would shoot whomever he encountered and, according to C.M., was meant to "give [McKinney] a different idea" and get McKinney "away from the idea . . . of hurting anyone." Placed in context, this statement does not so clearly imply what the majority asserts it does. Rather, it again fits Hedlund's profile of attempting to mitigate McKinney's aggressive tendencies.

¶67 As further support for its assertion that the aggravator is particularly strong in this case, the majority states that "Hedlund's only motive in shooting McClain in the back of the head while McClain slept was to facilitate the robbery." *Supra* ¶ 34. And this Court has previously stated there was "ample evidence" that Hedlund was the one who shot McClain. *McKinney*, 185 Ariz. at 580. However, there is no evidence which brother shot McClain, and while the evidence relied upon in *McKinney* does demonstrate that Hedlund participated in the McClain robbery, it does not, in fact, support the conclusion that he shot McClain. *See id.* At Hedlund's sentencing, the trial court, after citing that same evidence, asserted "it is unclear as to whether Mr. Hedlund or Mr. McKinney fired the shot which actually killed Mr. McClain."

¶68 As discussed above, the mitigation evidence established Hedlund's overarching motivation was, as it had been since childhood, to protect his siblings, follow along with McKinney, particularly as McKinney grew more aggressive in the months leading up to the crimes, and to mitigate, to the extent he could, his brother's criminal tendencies. Thus, the fact that he attempted to sell or hide the weapons after the crime is not, contrary to the majority's assertion, illustrative of his financial motives. *See supra* ¶¶ 35–36. McKinney's aggressiveness in demanding Hedlund's car and companionship before the crime also makes it unclear whether Hedlund supplied the gun used in the McClain murder or McKinney simply commandeered it. *See supra* ¶¶ 35–36. Further, although Hedlund participated in the McClain burglary despite knowing McKinney had killed Mertens, that fact, again, fits with both Dr. Holler's and the lay witnesses' testimony about Hedlund's loyalty to McKinney. Shortly before the burglaries, Hedlund expressed his distress over McKinney being "up to his old things again" and "had broken into houses." When his friend advised

Hedlund to stay away from McKinney, Hedlund replied "That's very impossible, with him being my brother."

**¶69** After considering all the evidence, it is clear that Hedlund's motivation to participate in the crimes could just as easily have been out of love for and loyalty to McKinney, as well as a misguided attempt to mitigate McKinney's actions and their consequences, as it was out of a personal desire to benefit financially. *Cf. White v. Ryan*, 895 F.3d 641, 645–46, 658–59, 673 (9th Cir. 2018) (counsel ineffective for not challenging pecuniary gain where evidence showed co-defendant planned murder and pressured defendant into committing crime on her behalf, "suggesting [defendant] acted out of love rather than pecuniary gain"); *State v. Prasertphong*, 206 Ariz. 167, 170 ¶¶ 6, 11–13 (2003) (pecuniary gain not proved where evidence showed defendant may have been "unaware" of co-defendant's intent to kill and post-murder actions possibly committed "out of shock or panic"). Accordingly, the evidence does not suggest, like the cases in which this Court affirmed the death penalty based solely on pecuniary gain, that Hedlund abused a position of trust with McClain with the primary intent to benefit financially. This aggravator, while proven beyond a reasonable doubt, is therefore not entitled to the great weight the majority attributes to it.

### Balancing

**¶70** In considering the mitigating factors, this Court is obligated to weigh them separately and cumulatively, and then determine whether that evidence outweighs the state's aggravating evidence. *See White*, 194 Ariz. at 350 ¶ 19. Put another way, this Court cannot view each piece of mitigating evidence in isolation, but must consider the sum of its parts. We do not merely compare the number of aggravating and mitigating factors, *see State v. Greene*, 192 Ariz. 431, 443–44 ¶ 60 (1998), but "where significant mitigating evidence is balanced against a single aggravating factor, a serious question is raised as to whether a death sentence is warranted," *Marlow*, 163 Ariz. at 72; *see also Bocharski*, 218 Ariz. at 499 ¶ 112 (when faced with "limited aggravation evidence and . . . strong mitigation evidence," leniency warranted).

¶71        *Stevens* is instructive.  There, the defendant called his co-worker to arrange a drug sale.  158 Ariz. at 596.  When his co-worker arrived with the victim, the defendant robbed them and then shot the victim in the head. *Id.*  The mitigation evidence was substantially similar to that presented in this case and in *Graham*:  the defendant had no prior criminal history, no record revealing a propensity for violent crime, was described as nonaggressive and passive, and his past harmful actions were nearly always the result of an outside influence.  *Id.* at 599–600.  Leniency was thus warranted because "Stevens' condition at the time of the offense was a major and contributing cause of his conduct and was sufficiently substantial to outweigh the aggravating factor of pecuniary gain."  *Id.* at 600; *see also Marlow*, 163 Ariz. at 71–72 (pecuniary gain outweighed by "dramatic disparity" in sentence compared to co-defendant); *Rockwell*, 161 Ariz. at 15–16 (mitigation evidence showing defendant suffered severe trauma and head injuries following motorcycle accident years earlier outweighed financial motive); *cf. State v. Hensley*, 142 Ariz. 598, 604 (1984) (leniency not warranted where defendant shot victims in back of head after robbery to eliminate witnesses and only mitigating evidence that defendant "obtained a G.E.D. degree").

¶72        In this case, the substantial mitigating evidence outweighs the aggravating evidence presented.  Notably, I joined with the majority in affirming the death sentence for McKinney.  *See McKinney*, 245 Ariz. 225.  Notwithstanding the additional aggravators present in McKinney's case, *see id.* at 227–28 ¶¶ 7, 16, a comparison between the two men illustrates why each case compels a different conclusion on the appropriateness of the death penalty.

¶73        To begin, the difference in how the family described the two men is telling.  *See State v. Watson*, 129 Ariz. 60, 63 (1981) (court must review "all the records").  Their sister described McKinney, whom she was aware also faced the death penalty, as "a very, very vicious child" who "scared the hell out of [her]," whereas Hedlund was "mild mannered" and "timid." Whereas McKinney would frequently steal for his stepmother, Hedlund refused and instead would tell his grandmother or another adult about his stepmother's requests.  Their sister recounted that McKinney often hit the other children and "provoked every fight there was and then would blame

it on [his siblings]." In one instance, she, Hedlund, and their other sister climbed into a treehouse, and McKinney then set the tree on fire. In another incident, McKinney told the family he was digging "graves" in a canal bank near their house "[b]ecause [he was] going to kill all of [them]."

¶74 In relation to the crimes themselves, when C.M. told McKinney and Hedlund that he had heard about Mertens's death, Hedlund "had a very serious, somber look," but McKinney "smil[ed]." Hedlund became "agitated," "somber," and "distressed" after the crimes and told C.M. he had a "bad conscience," but McKinney's personality did not change. Hedlund was "glad" C.M. talked with the police about the case, but McKinney told C.M. he would "go down as well" if he "snitched [McKinney] off." And the manner in which McKinney killed Mertens was "especially heinous, cruel or depraved." *McKinney*, 245 Ariz. at 227 ¶ 7.

¶75 McKinney's disturbing background and actions "set[] him apart from the usual murderer." *Watson*, 129 Ariz. at 63; *see also Spears*, 184 Ariz. at 295. Hedlund, however, does not stand out as "the worst of the worst." *White*, 194 Ariz. at 357–58 ¶ 55 (Zlaket, J., dissenting). Despite his abusive childhood, he did not develop the violent and homicidal tendencies of his brother. Rather, as the oldest child, he developed a strong, seemingly pathological, need to protect his younger siblings and facilitate a sense of belonging and family. Until McKinney reentered his life, Hedlund worked a steady job, supported his sisters and mother, and generally led a quiet life. Indeed, Durand testified that, of all the family she had talked to, none of them was "surprised by the accusations against [McKinney]," but they "were in utter disbelief that [Hedlund] could have been involved." In sum, Hedlund's background and neuropsychological impairments, "while not making [him] unaccountable for his crime," support leniency in the form of a sentence of life imprisonment. *Rockwell*, 161 Ariz. at 15.

¶76 "Where there is a doubt whether the death sentence should be imposed, we will resolve that doubt in favor of a life sentence." *State v. Valencia*, 132 Ariz. 248, 250 (1982); *see also Marlow*, 163 Ariz. at 72; *Rockwell*, 161 Ariz. at 16. In this case, the substantial mitigating evidence, taken as a whole, when balanced against a single aggravating factor that is not, in my view, "especially strong," as the majority characterizes it, *supra* ¶¶ 13, 34 is

at least enough "to question whether death is appropriate," *Trostle*, 191 Ariz. at 23.  For this reason, Hedlund's death sentence should be reduced to life imprisonment.